William F. CLARK, Trustee in bankruptcy for Hood Ceramic Corporation

v.

FERRO CORPORATION.

Civ. A. No. 3783.

United States District Court
E. D. Tennessee, S. D.

Dec. 29, 1964.

Spears, Moore, Rebman & Williams, Chattanooga, Tenn., for plaintiff.

Folts, Bishop, Thomas, Leitner & Mann, Chattanooga, Tenn., for defendant.

FRANK W. WILSON, District Judge.

In this case the plaintiff, William F. Clark, acting in his capacity as trustee in bankruptcy for Hood Ceramic Corporation (hereinafter referred to as "Hood"), seeks to recover damages from the defendant, Ferro Corporation (hereinafter referred to as "Ferro"), for the alleged breach of contract for the design and construction of a kiln used in the manufacture of quarry tile. A counterclaim has been filed by the defendant in which it is alleged that Hood is indebted unto the defendant in the sum of $4,247.78 on an open account and the further sum of $25,000.00 plus interest and attorney fees due upon a note. The case was tried by the Court sitting without a jury.

The plaintiff, Hood Ceramic Corporation, formerly known as the B. Miflin Hood Company, was for many years engaged in the production and sale of

quarry tile, along with related products, with its plant located at Daisy, Tennessee. Quarry tile is a form of tile used in construction, particularly in tile floor construction, it being most often seen in red and buff color. It appears that Hood was at one time perhaps the largest producer of this type of tile in the United States, manufacturing in excess of 30% of the total production of this tile in the nation. For many years, in fact until 1958, the plaintiff fired its tile in periodic kilns, described as "beehive" kilns by reason of their appearance. In more recent years a continuous kiln, known as a "tunnel" kiln, also by reason of its appearance, had been developed in the industry and installed by many of Hood's competitors so that by 1949 Hood found itself in a poor competitive position and rapidly losing its dominance in the market. It thereupon undertook negotiations with the defendant for the design and installation of a tunnel kiln, which negotiations ultimately and after lengthy delays,

due in part to the ill health of the president of Hood and in part to Hood's difficulty in financing construction of a new kiln, led to the execution under date of May 7, 1957, of the contract herein sued upon. The defendant, Ferro Corporation, through its Allied Engineering Division, with offices located in Cleveland, Ohio, is engaged in the business of designing and constructing kilns for the production of quarry tile. It appears to bear a most favorable reputation in the field of designing and constructing tunnel kilns. As noted above, negotiations between the parties extended over a period of years, but ultimately resulted in the execution of a contract under date of May 7, 1957. By the terms of this contract the defendant was to design and construct a tunnel kiln for Hood at its plant in Daisy, Tennessee, for the price of $190,000.00. Attached to and made a part of the contract was a set of general specifications relating to the kiln, including the following:

"SIZE OF KILN—Length of Kiln—250'-0" plus two track
 67'-8" Preheater
 Setting width — 58"
 Setting height — 21" above dock

OPERATING TEMPERATURE—Cone 10 or lower

ESTIMATED PRODUCTION—5000 square feet 6" x 6" per
 24 hours

ESTIMATED TOTAL FIRING CYCLE—78 hours

ESTIMATED SCHEDULE—2 hours and 10 minutes per car"

———◆———

Certain site preparation was to be performed by Hood, including construction of a building to house the kiln. This work was duly performed by Hood and upon September 30, 1957, the design of the kiln having been completed, construction of the kiln was begun. Construction of the kiln was completed upon January 10, 1958.

Thereafter one or more persons from Ferro remained upon the site to supervise the starting of the kiln and to make adjustments necessary to put the kiln into proper operation. Many problems

were encountered, as testified to in the proof, with a result that it was not until December 1958 that the last of the Ferro personnel departed, leaving the further operation of the kiln unto Hood. Payment of the contract price of $190,-000.00 was made by Hood to Ferro from the proceeds of a loan obtained by Hood from the Small Business Administration. The right of Hood to make claim against Ferro for any alleged breach of contract was expressly reserved at the time of the final payment. Following the turning over of the kiln to Hood, both production

and financial problems continued to be encountered by Hood with the result that in August of 1961 a voluntary petition in bankruptcy was filed and Hood was adjudged a bankrupt. This lawsuit was instituted about the same time and was adopted by the trustee in bankruptcy.

There appears to be no dispute with regard to the amounts claimed by Ferro in its counter-claim. The amount of $4,247.78 is owed by Hood upon open account. The note for $25,000.00 represents a loan made by Ferro to Hood in 1958 when Hood was in need of operating capital. An issue was raised by the plaintiff with regard to the right of Ferro to assert their claim in this case rather than filing the claim in bankruptcy, but the law appears to be settled that the right of setoff or counter-claim to which a debtor of a bankrupt is entitled may be asserted in any court in which the trustee sues to recover a debt owing unto the bankrupt estate. 9 Am.Jur.2d Bankruptcy, Sec. 519; 11 U.S.C.A. § 108; Smith v. Hale, 56 S.D. 12, 227 N.W. 373; Blake v. Weiden, 291 N.Y. 134, 51 N.E.2d 677, 149 A.L.R. 1050; In Re Field Heating & Ventilating Co., Inc., 201 F.2d 316 (C.C.A. 7, 1953).

There are three major issues raised in the trial of this case which require decision by the Court. The first issue involves the construction of the contract entered into by the parties for the design and erection of the kiln. The plaintiff contends that the defendant contracted to design and erect a tunnel kiln that would have a firing cycle of 78 hours, would operate on a schedule of one kiln car each two hours and ten minutes, and fire a minimum of 5,000 square feet of 6″ x 6″ x ¾″ quarry tile or a minimum of 7,500 square feet of 6″ x 6″ x ½″ quarry tile in a 24 hour period, seven days a week and 365 days a year, and that the tile thus produced would be not less than 95% standard or marketable grade. In arriving at this construction of the contract, the plaintiff further contends that the contract in its specifications is ambiguous and that parol evidence of prior negotiations is admissible in arriving at a construction of the contract. The defendant upon the other hand contends that its obligation under the contract was only to properly design a kiln along the lines described in the specifications, in which the production schedule and quantity were only estimates, and then erect the kiln in accordance with that design. The defendant denies that it specified that it would construct a kiln that would produce any particular percentage of marketable or standard grade tile and contends that no ambiguity exists in the contract in this respect which would render admissible parol evidence to vary or add to the specifications in this regard, but rather that paragraph X of the contract specifically provided that the written agreement constituted the whole agreement between the parties. The defendant further denies that the parol evidence relied upon by the plaintiff would in fact establish any specification with regard to the production of a minimum percentage of marketable or standard grade tile.

The second major issue for decision by the Court is as to whether the evidence establishes a breach of contract by the defendant. In this regard the plaintiff has introduced evidence which it contends establishes that only 41.25% of the tile fired through the kiln from January 1, 1958, through August 21, 1961, the date of bankruptcy, was of standard or marketable grade, with the kiln, by reason of defective design and construction, causing cracking or other defects in the remaining tile fired through it. The defendant, upon the other hand, contends that no breach of the contract has been shown, that the evidence establishes that after the initial adjustment of the kiln in operation, the kiln operated satisfactorily, produced up to 80% to 95% standard grade tile, with cracking and defects in the tile being caused not by the design and operation of the kiln, but rather by the plaintiff's other antiquated equipment and methods and by numerous other production faults and errors.

The third major issue for decision by the Court relates to the measure and

proof of damages. The plaintiff contends that the law entitles it to recover for sums spent by it in an effort to bring the kiln up to specifications and for the loss of profits on the sale of tile due to the failure of the kiln to produce marketable or standard grade tile in accordance with the specifications. The defendant denies that the plaintiff is entitled either by law or under the provisions of the contract to recover for any alleged loss of profits on the sale of tile, denies that the plaintiff has introduced any competent evidence of expenditures by it in the repair of any defect in the design or construction of the kiln and denies that the plaintiff has introduced any competent evidence of profits alleged to have been lost or that they were lost by reason of any cause attributable to the kiln.

■ Returning to the issue of the construction of the contract, the Court is of the opinion that the specifications are ambiguous with regard to the production to be designed and constructed into the kiln and that parol evidence upon this issue was properly admitted. 20 Am. Jur., Evidence, Sec. 1147. The contract specifies "estimated production—5000 square feet 6″ x 6″ per 24 hours". Only two dimensions of the tile are given in this specification, the thickness of the tile being omitted. The thickness of the tile is significant in that approximately one-third or more tile of ½″ thickness could be loaded upon each kiln car than would be the case of tile ¾″ in thickness. The evidence reflected that a tile ¾″ in thickness was produced by Hood prior to installing the tunnel kiln and that Dr. Robson, who was Vice President of Ferro and Manager of the Allied Engineering Division and was in charge of the design of this kiln, had visited and inspected the plaintiff's plant upon several occasions prior to drawing the contract and specifications and was aware that Hood produced ¾″ tile. Although some contention appears to have been made on behalf of Ferro that Tile ½″ thick was more common in the industry, it was con-

ceded by Dr. Robson that the reference in the specifications to 6 x 6 tile might appropriately be interpreted as referring to either or both tile ¾″ and ½″ in thickness. The Court is therefore of the opinion that in specifying estimated production the contract had reference to "5000 square feet of 6″ x 6″ x ¾″ per 24 hours". The quantity of tile which the kiln was to be designed to fire in any 24 hour period was therefore 5000 square feet of 6″ x 6″ x ¾″ tile or 7500 square feet of 6″ x 6″ x ½″ tile.

■ While the quantity of tile that may be fired in a given period is thus specified, no reference is made in the contract or in the specifications to any percentage of marketable tile that may be fired. The only purpose of the kiln was to produce marketable tile. Otherwise it was worse than valueless, for it could only be a source of financial loss. The argument on behalf of the defendant that the defendant's only obligation was to construct a kiln of "proper" design appears specious unto the Court until the term "proper" is related to the production of usable or marketable tile. Surely no valid argument could be advanced that a kiln was properly designed if it would not produce usable ware, regardless of the quantity that might be fired. The correctness of its design and construction can ultimately be tested only by the results produced in terms of usable tile. Surely no valid argument could be made that a kiln which could produce no usable or marketable tile was properly designed and constructed. The critical factor to be designed and built into a continuous kiln is not just to raise the heat sufficient to fire the tile and then cool the tile, but to do so in such a regulated, even and controlled manner that usable tile will be produced. Thus it appears unto the Court that omission of any reference to usable or marketable or standard grade tile to be produced by the kiln would create an ambiguity in the specifications that may properly be supplied by parol evidence.

The defendant relies upon the following language in the contract as forbidding the use of parol evidence:

"ARTICLE X. Neither party assumes responsibility for statements not contained in this agreement, and modification hereof shall not be binding unless made in writing and signed by the parties to be bound thereby."

This language, however, neither relieves the ambiguity nor prevents the application of the parol evidence rule. The evidence reflects that during the period of the negotiations, and under date of October 24, 1953, Dr. Robson, on behalf of the defendant, wrote a letter in which he stated that:

" * * * You will produce 5000 square feet of tile per day, seven days a week, 365 days per year.

"You will produce an average of not less than 95% standard or saleable tile. Actually our latest figures from one plant are 97% to 98% first grade ware. This ware is of uniform color and absorption so that necessary adjustments due to faulty tile in the job are entirely eliminated."

The defendant contends that this letter was supplied at the request of Hood to aid in its application for financing the installation of the kiln, and was therefore in the nature of "puffing" or sales talk for use in obtaining the loan. However, upon the trial Dr. Robson affirmed the correctness of the above statements in the letter. The defendant argues that it is unreasonable to assume that any warranty as to production of usable tile would be given, as defects in tile might be, and in this case were, produced at many steps in the production process unrelated to the kiln or its proper operation. The specifications of the quantity of usable ware would of course relate only to defective tile produced by causes related to the design and construction of the kiln, not to other causes and would assume a proper use of the kiln, including the placing of a proper product into the kiln. The Court is of the opinion that the negotiations between the parties were conducted with the understanding that the kiln would be designed so as to produce 95% standard grade or marketable tile and that this evidence may be looked to in clarification of the specifications.

With the construction of the contract having been thus established, the Court is of the further opinion that the evidence establishes a material breach of the contract by the defendant. As noted above, the construction of the kiln was completed by January 10, 1958. There was no dispute but that the initial firing of the kiln and its adjustment and regulation was a part of the defendant's obligation under the contract. One or more representatives of the defendant remained on the job for this purpose until the following December. The plaintiff seeks to assert improper performance of the kiln during this period as evidence of the breach. There is considerable conflict in the evidence as to the performance of the kiln during this period. The plaintiff introduced evidence which would tend to show that no usable tile was produced until March of 1958 and that by December the kiln was still responsible for the cracking of more than 50% of the tile fired through it. On the other hand, the defendant introduced evidence that would tend to show that after the initial regulation of the kiln, including the loading of tile on the kiln cars properly and the regulation of the speed or cycle of the cars through the kiln, the cracking and warping and other defects in the tile were caused by a multitude of other deficiencies and errors in Hood's manufacturing process and not by the kiln and that as these errors in production were corrected the production of usable and standard grade tile produced by the kiln rose steadily until in December of 1958 ten cars (11 cars of ¾" tile equal 5000 square feet) were being taken from the kiln with 80% standard grade tile thereon.

However, the Court is of the opinion that much of that evidence cannot be looked to for establishing a breach by the defendant of its contract. The Court

cannot test compliance of the kiln with specifications until the defendant has time and opportunity to complete its performance under the contract. The contract specified no time limit within which the kiln was to be designed, built and placed in operation. The Court must therefore assume a reasonable time for completion of performance by the defendant. No contention appears to have been made that the defendant unduly delayed its performance under the contract. Moreover, if an issue were raised as to this, the Court could not say under the record in this case that the defendant did use an unreasonable time in completing its performance. There was evidence that the time necessary for adjusting a kiln and getting it into efficient operation after its construction varied from a few weeks to two years. By December of 1958 the defendant ceased any further work with regard to the kiln and must have considered its performance under the contract complete, although Hood was still complaining of the performance of the kiln.

▇ It is apparent from the evidence, however, if not undisputed, that from and after December of 1958 until the time of bankruptcy, Hood was never able to obtain a production from the kiln of 5000 square feet of ¾″ tile or 7500 square feet of ½″ tile, of which 95% were usable or standard grade. In this regard Hood appears to have kept a daily count of the tile produced and the tile cracked. The defendant has objected to the admissibility of these records upon the ground that the person who conducted the count was not produced for examination and upon the ground that various inaccuracies in the records were shown to have existed. These matters, however, would go to the weight to be given to this evidence, not to its admissibility, it being admitted as a business record made and kept in the ordinary course of business and otherwise complying with the requirements of 28 U.S.C.A. § 1732. These records, though apparently erroneous in some details, are nevertheless the most reliable evidence introduced as to the daily production of tile and the percentage of cracked tile, and the Court will therefore accept them for the purpose of establishing these facts. These records appear to reflect that Hood, from and after December 1958, was unable on the average to get more than eight cars of tile (11 cars of ¾″ tile equal 5000 square feet) of which not more than 60% on the average were uncracked and of standard grade.

The defendant contends that such cracking as was shown was not shown to be due to the kiln or its design, but rather was due to a multitude of other causes unrelated to the kiln and its operation. It is certainly true that cracking and any other defect in the tile not shown to have been caused by the kiln could not be relied upon as evidence of any breach of the defendant's contract. To the extent that the cracking or other defects were due to the quarrying, the grinding, and the mixing of the clays, the extruding, cutting and handling of the tiles or the drying process, or any other steps in the manufacture prior to or subsequent to the firing of the tile in the kiln, such cracking or other defects could not constitute evidence of a breach of the defendant's contract. However, the testimony appears to have reflected that the cracking here involved, or a substantial part thereof, followed a pattern, depending upon the location of the tile upon the kiln car. The bulk of the cracking appeared in the tile located on the outside rows of the kiln car, with the inner stacks producing relatively few cracked tile. The evidence further reflected that improper fluctuations in heat within the kiln might cause such a pattern of cracking, with the inner rows of tile being more protected from such fluctuations. It further appeared that the percentage of cracking improved when the rows of tile were loaded close together on the kiln car, rather than allowing for the circulation of heat between rows as is more normally done. Witnesses experienced in the operation of tunnel kilns testified that while random cracking of tile might be due to any

number of reasons, a cracking that followed a pattern related to the loading and the location of the tile in moving through the kiln was due to the design and operation of the kiln.

The Court is of the opinion that the evidence here establishes that a substantial part of the cracking in tile was caused by the kiln in its design and construction, such cracked tile being sufficient in quantity to constitute a breach of the defendant's contract both with regard to the quantity of tile which could be fired daily through the kiln and with regard to the percentage of standard grade or marketable tile that could be produced.

There remains for decision the issue of damages. In this regard an issue of law has arisen between the parties as to the proper measure of damages and the elements of damage which may be considered by the Court. It is the contention of the plaintiff that Hood would be entitled to recover the following elements of damage to the extent that they may be established with reasonable certainty by the evidence: (1) the difference in the contract price of the kiln designed and constructed by the defendant and the value of the kiln as actually constructed; (2) the expenditures made by the plaintiff in attempting to modify the kiln in order to make it operate in accordance with the specifications of the contract; (3) Hood's business losses and loss of profits resulting from the failure of the kiln to perform in accordance with the contract specifications. There is no evidence in the record with regard to the value of the kiln as constructed. Hence the Court will not be concerned with the contention that the plaintiff is entitled to recover the difference between the contract price and the value of the kiln as constructed. With regard to the second element of damage claimed by the plaintiff, while the defendant denies that the plaintiff has introduced any competent evidence of expenditures made by the plaintiff to bring the kiln up to specifications, a matter which will be later considered by the Court, no issue of law appears to exist between the parties but that a proper element of damage for breach of contract of the nature here involved is the reasonable cost to the owner of bringing the kiln up to contract specifications upon a finding of a breach by the defendant in this regard. The principal issue of law between the parties with reference to damages relates to the right of the plaintiff to recover alleged business losses and loss of profits upon a showing of breach of the contract here involved. In this regard the defendant, in addition to denying the right of the plaintiff to recover any such business losses or loss of profits, also denies the sufficiency of the evidence to establish such damages. The Court will first direct its attention to the law of damages as it relates to the recovery of loss of profits upon breach of contract, reserving for now any consideration of the evidence in this regard.

Compensation, and not reward or penalty, is the primary aim in measuring damages for breach of contract. The general purpose of the law is to place the plaintiff in the position he would have been in had the contract been fulfilled in accordance with its terms. At one time in the development of the law this general statement of the rule of damages in breach of contract cases was about all the law there was to guide the finder of fact, except for a few special rules for particular types of agreements which are not here significant. However, in 1854 the English Court of Exchequer handed down an opinion in the case of Hadley v. Baxendale, (9 Ex. 341, 156 Eng. Reprint 145, 5 Eng.Rul.Cas. 502) that has since furnished the generally accepted standard for determining the measure of damages for breach of contract. A claim was there made against a carrier for breach of contract by delay in delivery of a shipment. The damage claimed was for loss occasioned by the enforced idleness of a mill due to a delay in the shipment of a grist mill shaft. The Court, in denying recovery for such loss on the ground that they were not in the contemplation of the parties at

the time the shipment contract was made, laid down the rule that damages recoverable for breach of contract are (1) such as may fairly and reasonably be considered as arising in the usual course of events from the breach of the contract itself, or (2) such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract. Thus the rule was established that while direct and usual damages could be recovered irrespective of whether such damages were shown to be in the contemplation of the parties at the time the contract was made, losses of an unusual kind, sometimes termed "consequential" or "special" damages, can only be recovered where they are shown to have been in the contemplation of the parties at the time they made the contract. 15 Am.Jur., Damages, Sec. 52.

The rule in Hadley v. Baxendale has been adopted in Tennessee. Western Union Telegraph Co. v. Green, 153 Tenn. 59, 281 S.W. 778, 48 A.L.R. 301; Gardner v. Deeds, 116 Tenn. 128, 92 S.W. 518, 4 L.R.A.,N.S., 740; Brown v. Taylor, 115 Tenn. 1, 88 S.W. 933, 4 L.R.A.,N.S., 309; Chisolm & Moore Mfg. Co. v. United States Canopy Co., 111 Tenn. 202, 77 S.W. 1062; Illinois C. R. Co. v. Southern Seating & Cabinet Co., 104 Tenn. 568, 58 S.W. 303, 50 L.R.A. 729; Wadsworth v. Western Union Telegraph Co., 86 Tenn. 695, 8 S.W. 574. The rule has likewise been adopted by the Restatement of Contracts, and is set forth in Section 330 as follows:

"In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise it must be shown specifically that the defendant had reason to know the facts and to foresee the injury."

In the case of Chisolm & Moore Mfg. Co. v. United States Canopy Co., supra, involving a claim for loss of profits due to breach of contract by the defendant in furnishing defective parts for use by the plaintiff in manufacturing canopies, the Tennessee Court expressly relying upon Hadley v. Baxendale, stated:

"It is true, in general, that the measure of damages for breach of an executory contract of sale of personalty is the difference between the contract price and the market value of the goods at the time and place of delivery. Cole v. Zucarello, 104 Tenn. 64, 56 S.W. 850. It is also true that, in general, profits cannot be allowed as damages, for the reason that they are usually uncertain; depending, as they do, upon the dangers and hazards of business. But it cannot be said that there are no exceptions to the rule.

"The reasons underlying the general rule, and also a succinct statement of the grounds of the exceptions recognized to the rule, may be found in the following excerpt from Howard v. Stillwell & B. Mfg. Co., 139 U.S. 199, 11 Sup.Ct. 500, 35 L.Ed. 147, which we adopt as a sound statement of the law, viz:

" 'The grounds upon which the general rule of excluding profits in estimating damages rests are (1) that in the greater number of cases such expected profits are too dependent upon numerous uncertain and dangerous contingencies to constitute a definite and trustworthy measure of actual damages; (2) because such loss of profits is ordinarily remote, and not, as a matter of course, the direct and immediate result of a nonfulfillment of the contract; (3) and because most frequently an engagement to pay such loss of profits in case of default in the performance is not a part of the contract itself, nor can it be implied from its nature and terms. [Citations omitted.] But it is equally well settled that the profits which would have been realized, had the contract been performed, and which have been prevented by its breach, are included in

the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, and where, from the expressed or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into. [Citations omitted.]' "

█ Returning now to the evidence in this case, the Court is of the opinion that the plaintiff has established its right to recover $11,000.00, which sum the evidence reflects was expended by Hood in an effort to modify the kiln and get it up to contract specifications. The testimony was that a "minimum" of $11,000.00 had been spent by Hood in this effort. The defendant attacks the sufficiency of the evidence in this regard both upon the ground of a lack of showing of any breach, which has been heretofore dealt with by the Court, and upon the ground that a portion of the $11,000.00 was spent for replacing the fire brick on the kiln cars, or, as it is referred to in the trade, replacing kiln car "furniture". It is the defendant's contention in this regard that it was not its custom to provide kiln car furniture and it never intended to furnish such "furniture" under this contract, only doing so because of Hood's difficult financial condition. The plaintiff contends that the kiln "furniture" was part of the contract. The contract is in fact silent upon this detail and the defendant did in fact provide the "furniture". This is sufficient, under these circumstances, to persuade the Court to find that the providing of the "furniture" was a part of the defendant's obligations under this contract, irrespective of its custom in this regard.

█ With regard to the plaintiff's right to recover business losses and loss of profits, the Court is of the opinion that the plaintiff has not established any right to such damages both as a matter of law and by reason of the terms of the contract and by reason of the speculative and uncertain nature of the evidence relating to such losses.

The Court is of the opinion that while expenditures made in an effort to bring the kiln up to contract specifications would be such a direct, usual and foreseeable loss as to be subject to recovery, alleged business losses and loss of profits would not be such a direct, usual and foreseeable loss, but rather would be an indirect or consequential loss. In the absence of a showing that damages for business losses and loss of profits were in the contemplation of the parties at the time they made the contract, the Court is of the opinion that such damages would not be recoverable under the rule of Hadley v. Baxendale, supra, and Chisolm & Moore Mfg. Co. v. United States Canopy Co., supra. Upon the contrary, the parties here expressly contracted against liability for consequential damages. Paragraph IX expressly provides that

"The engineer assumes no liability for consequential damages of any kiln and the purchaser by the signing of this agreement will assume all liability for the consequences of its use or misuse."

█ The term "consequential damages" has been defined as follows in 25 C.J.S. Damages § 2:

"*Consequential damages.* Consequential damages are such as are not produced without the concurrence of some other event attributable to the same origin or cause. The term may include damage which is so remote as not to be actionable. It has also been defined as synonymous with the term 'special damages.' "

The validity of somewhat similar contract provisions against liability for certain types of damage, including consequential damage, appears to have been sustained in Tennessee as well as other jurisdictions. Hayssen Company v. Southern Donelson & Poston, Inc., 51 Tenn.App. 57, 364 S.W.2d 489 (1962); Despatch Oven Company v. Rauenhorst,

229 Minn. 436, 40 N.W.2d 73 (1949); Monarch Brewing Co. v. George J. Meyer Mfg. Co., 130 F.2d 582 (9th Cir., 1942); Wallich Ice Machine Co. v. Hanewald, 275 Mich. 607, 267 N.W. 748 (1936); Nelson v. Swedish Hospital, 241 Minn. 551, 64 N.W.2d 38 (1954); and Martin v. Southern Engine and Pump Co., Tex.Civ.App., 130 S.W.2d 1065 (1939).

 Even were the plaintiff otherwise entitled to recover loss of business profits, the Court is of the opinion that the evidence here fails to establish such loss with a sufficient degree of certainty to permit a finding for the plaintiff in this respect. The plaintiff seeks to establish Hood's damage in this regard by using gross kiln tile input figures for the years in which the kiln operated to the date of bankruptcy and, assuming a 95% recovery of marketable tile, thus arrived at a gross production of saleable or standard grade tile. Then, by assuming the sale of all such standard grade tile at a price equal to the 1956 price list, a gross income is arrived at. The actual gross income for the period in question is then subtracted, thus arriving at the amount of the gross loss of sales. The net loss of profits is then arrived at by assuming a 20% figure as the cost of production, overhead and sales expense. It is apparent from the record that each of the above assumptions is subject to serious criticism and question. For example, it is obvious from the proof that not all unsaleable or defective tile was due to the kiln, but that a substantial amount was due to other problems in the production process, particularly in the period of 1958 and 1959. Thus the assumption of a 95% recovery of marketable tile, even had the kiln worked perfectly, would not be a valid assumption. The assumption of the sale of all tile at the 1956 price level is likewise an assumption subject to criticism. The assumption of a 20% figure for cost of production, overhead, sales expense and management policy is wholly unsupported by any evidence. Finally, the Court must assume that the actual gross income figures for 1958 through 1961, as used in the computation, were unaffected by any factors other than the kiln. This likewise is obviously an invalid assumption, as many factors entered into the gross income for the years 1958 through 1961 other than the operation of the kiln. Thus it is apparent unto the Court that the evidence of loss of profits is too uncertain, speculative, contingent and remote to permit any award of damages for such alleged losses.

A recovery will be allowed unto the plaintiff upon the original suit in the amount of $11,000.00. A recovery will be allowed unto the defendant upon its counter-claim to the extent of $29,247.78 plus interest in accordance with the note and attorney fees as determined in accordance with the stipulation of the parties in the pre-trial order. This opinion will constitute the findings of fact and conclusions of law of the Court. A judgment will enter accordingly.