MINNEAPOLIS SOCIETY OF FINE
ARTS and Dr. Elie Borowski,
Plaintiffs,

v.

RAILWAY EXPRESS AGENCY, INC.,
Defendant.

No. 4-61-Civ.-22.

United States District Court
D. Minnesota,
Fourth Division.

Jan. 25, 1963.

John C. McNulty, Maslon, Kaplan, Edelman, Joseph & Borman, Minneapolis, Minn., for plaintiffs.

George W. Townsend, Carson, Townsend, Pratt, Trench & Ericson, Minneapolis, Minn., for defendant.

DEVITT, Chief Judge.

This is an action to recover for the claimed breach of a contract of carriage of a 2,500-year-old art object from Minneapolis, Minnesota to Basel, Switzerland. The art object, a bas-relief valued by its owner, Plaintiff Borowski, at $125,000, was delivered to the defendant with specific instructions for carriage by air from Minneapolis to Switzerland. The defendant caused it to be sent by rail from Minneapolis to New York, and by air, via Pan American Airways, to Basel. Upon its arrival there, it was found to be broken into several pieces.

Although the plaintiff, Minneapolis Society of Fine Arts, hereinafter called the Art Institute, when it shipped the bas-relief to Dr. Elie Borowski, the other plaintiff, in Switzerland, placed a "declared value" of $550 on the uniform air express receipt form, the plaintiffs claim that this limitation of liability was nullified when the defendant, contrary to instructions, caused the art object to be sent by the more hazardous rail route from Minneapolis to New York, and that they are entitled, under the admiralty principle of "deviation," to recover as at common law for the full value of the loss.

The defendant's position is that although the Art Institute first requested that the bas-relief be sent by air, it changed this routing direction by telephone the same day, March 6, 1959, and requested that it be sent by the cheaper

rail route to New York. Further, the defendant claims that even if such change of mode of transportation had not been given, the admiralty doctrine of deviation is not applicable to a land-air contract of this kind. It also asserts that the Art Institute worked a misrepresentation and statutory fraud upon the defendant by declaring the value of this art object to be only $550 when in fact it was of the value of $125,000, and that this misrepresentation prevents the recovery of any amount in excess of $550. It is also asserted by the defendant that the art object was improperly packed, and that such fact relieves it from all liability.

There is no question but that the art object involved is a genuine antique and an outstanding example of Archimedean art. It is a sandstone picturization of three satraps—one Persian and two Medes—presenting gifts to the then Persian ruler, Darius II, on the New Year's feast day. Plaintiff Borowski, a highly reputed art collector and dealer, and a recognized expert in near Eastern and Persian art, and an authority on Biblical art, acquired this art piece for a reputed $65,000 in 1957. Mr. Richard S. Davis, the then Director of the Art Institute, saw the piece in Switzerland in the late summer of 1958. He expressed great interest in it, and, with the thought that it would be acquired by the Minneapolis Art Institute for its collection, Dr. Borowski caused it to be sent to Minneapolis in November of 1958. Efforts were made by officers and trustees of the Art Institute to raise the $125,000 asking price, but these were unsuccessful. Thereupon, Borowski directed the Art Institute to return the bas-relief "by air immediately." It was repacked in cotton batting in the same wooden container in which it was shipped from Switzerland. Mr. Jerome J. Skar, Customs Clerk for REA in Minneapolis, was called to the Minneapolis Art Institute on March 6, 1959. He examined the piece in its box, recommended additional protection for the crate, and suggested that certain cross-pieces be put on it in order that it would not be set on its side. The air express receipt was specifically marked with the injunction "lay flat."

The bas-relief reached Switzerland on March 19, 1959 badly broken.

It is not disputed that the bas-relief was a genuine piece of ancient Persian art, that it was of substantial worth, and that its value was appreciably diminished by reason of the breakage.

It is stipulated that the defendant's legal name now is REA Express.

Four issues are suggested for decision:

(1) Whether the Minneapolis Institute of Art, through Mr. Davis, directed a change in the mode of shipment from air to rail;

(2) Whether, if Davis did not give such directions, the change from air to rail was a deviation so as to void the contract and thus permit plaintiffs to recover to the extent of their damages regardless of the $550 limitation;

(3) Whether, while making a declaration that the value was $550, the plaintiffs worked a misrepresentation and statutory fraud upon the defendant;

(4) Whether Plaintiff Art Institute had so improperly packaged the art object so as to relieve the defendant of liability; and a correlative question as to whether, assuming the art object was improperly packaged, this defect was waived by the inspection of the article and apparent approval of the packaging by Mr. Skar, representing the defendant.

Logically, the first issue to be decided is as to whether or not Davis, acting for the Art Institute, modified the previously given instructions to ship by air. Three witnesses testified on this issue. Two representatives of REA gave evidence to the effect that Mr. Davis telephoned the defendant's Minneapolis office on the afternoon of March 6, 1959 after the art object had been picked up by an REA

driver, and gave instructions that the article was to be shipped by rail from Minneapolis to New York. These two witnesses were Jerome Skar, the then Customs Clerk in Minneapolis, and Elmer J. Holley, then and now the Chief Customs Clerk in the defendant's Minneapolis office. Skar said that he was well acquainted with Mr. Davis's voice and had talked to him on many occasions in connection with shipments the Art Institute was making. He said that on the afternoon of March 6th, Mr. Davis called him and asked as to the difference in rates between shipping by air and shipping by rail between Minneapolis and New York. (The air rate for this shipment was $80.82; the rail rate was $20.58). When Skar gave this information to Mr. Davis, Davis directed that the article be sent by rail. Skar said that in previous conversations with Davis, in connection with other shipments, Mr. Davis had modified the modes of shipping. Skar said that his reaction following the telephone conversation was that Davis had changed his mind again.

Mr. Elmer J. Holley stated that he officed at a desk immediately adjacent to Mr. Skar, and that each used the same telephone. He said that on the afternoon of March 6, 1959, he heard Skar talk to Davis on the phone. Immediately following the conversation, he observed Skar, in a state of some agitation, redraw the transit papers in connection with the shipment of the bas-relief.

On the other side of this issue, Mr. Davis stated that he had no recollection of making a phone call to Mr. Skar changing the mode of transportation, and did not do so. He could not remember if Skar called him. He said that he had discussed the shipment a great deal with Mr. Skar and with Institute personnel when Skar was at the Institute earlier on the day of March 6th. Mr. Davis said that he did not know of any other personnel connected with the Minneapolis Institute who talked with Skar about the method of shipment. Miss Inez Quinn, Registrar at the Minneapolis Institute, said that she made no phone call and sent no messages to the defendant with reference to a change in the method of shipment.

Thus the fact question is presented. The Court must subscribe to either the Davis version of events or the Skar-Holley version. On balance, and in the light of the surrounding circumstances, the Court is of the view that the Skar-Holley version is entitled to greater weight. Both Skar and Holley were more certain in their recollection of events. Davis was somewhat hesitant, and while at one point he denied revoking the previously given method of transportation, yet at another point he said that he did not have a recollection of having done so.

The version of this fact controversy presented by the defendant is more logical since there would be no apparent reason for the defendant to modify the shipping instructions for sending by air when no showing has been made that the rail shipment afforded a larger net revenue return to the defendant. There is some reason why Plaintiff Art Institute would change the method of transportation—in order to reduce the cost. The Art Institute was bound by an arrangement with Plaintiff Borowski to defray the cost of returning the art object to Switzerland. The facts recited by Messrs. Skar and Holley are afforded additional credibility in view of their statements, and Mr. Davis's, that Davis had talked on the phone with personnel in the Minneapolis office of the defendant on many occasions in the past in connection with shipments, and it may be inferred from Skar's testimony that Mr. Davis had changed his mind about the method of such shipments on prior occasions.

The Court concludes that the preponderance of the evidence supports the view that the Art Institute, acting through Mr. Davis, called the defendant's office on March 6, 1959, and directed a change of the mode of shipment from air to rail from Minneapolis to New York. This fact-finding makes unnecessary a decision upon the other issues presented because the plaintiffs admit that such a

finding precludes a basis for recovery. But it is well, in view of the reasonable probability of appeal, that a decision on the "deviation" issue also be made.

The plaintiffs' theory in this connection is that, assuming the fact to be that the defendant itself changed the mode of transportation from air to rail, this constituted a deviation from the instructions given by the shipper. Since shipping by rail instead of by air constituted an appreciably more hazardous method of transportation for a delicate art object, it resulted in a voiding of the contract represented by the air express receipt and the tariffs filed by the defendant with the ICC in connection with land transit and with the CAB in connection with air transit, and made the contract void ab initio. It is urged that this relieved the plaintiffs from the $550 limitation of liability and permits recovery as under the common law.

The deviation doctrine is discussed and explained in The Sarnia, 278 F. 459 (2d Cir., 1922), cert. den. 258 U.S. 625, 42 S.Ct. 382, 66 L.Ed. 797. There is an annotation in 33 A.L.R.2d, 145.

In Farr v. Hain S. S. Co., 121 F.2d 940 (2d Cir., 1951), Judge Learned Hand made this enlighting observation about the doctrine:

"Nevertheless it has indeed always been treated as ipso facto a more serious breach than if it occurred on land; it goes to the essence of the venture, and it is clear enough why it should be so treated in extreme cases, though it is not entirely apparent why it should always be. Indeed, it may be doubted whether, if the law were to be formulated today for the first time, the same principle would not apply as applies to other contracts; i. e., that the only breach which entitles the promisee to repudiate the whole contract is one which goes to the root of the venture. * * * The law has not been so written, however, and certainly all but the most trivial deviations are considered gravely to affect the contract. How far they do affect it the courts are not in entire agreement; at times it has even been said that the shipowner converts the cargo * * * though we should hesitate to press the consequences so far. But it is settled that deviation strips the ship of all excuses in her charter-party, and imposes upon her at least the liability of a common carrier; i. e., of an insurer."

The deviation doctrine is purely of admiralty origin, and while it has been applied to some cases involving land transit, no recent federal cases have been cited to, or found by, the Court which make the doctrine applicable to land and air transit in conveyances which operate under filed tariffs such as do the railroads under the Interstate Commerce Commission or the airlines under the Civil Aeronautics Board.[1] In fact, there is a decision in the Second Circuit on an appeal from the United States District Court for the Southern District of New York which holds quite definitely that the doctrine is not applicable to cases of this kind. Lichten v. Eastern Airlines, Inc., 189 F.2d 939 (2d Cir., 1957). The District Court decision is found in 87 F.Supp. 691. Here is what Judge Irving Kaufman, the trial judge, said about the doctrine:

"This contention of plaintiff is based on the archaic theory that any negligence or deviation from the stated contract or carriage terminates the contract so that a defendant in an action can no longer rely on a limitation of liability clause in the contract. However, the theory has not been followed by Federal courts in cases arising under the

---

[1]. Plaintiffs' reliance upon Brown & Haywood Co. v. Pennsylvania Co., 63 Minn. 546, 65 N.W. 961 (1896), is misplaced. In addition to making no reference to federal rate schedules and the like, the Court there merely held that the defendant's acts constituted conversion of the goods resulting in the defendant becoming an insurer of them.

Interstate Commerce Act, (e. g. the cases denying recovery even where the carrier was held to have negligently converted the cargo * * *) and with good reason. According to plaintiff's theory, any deviation from the contract or loss would make the valuation clause in the contract ineffective. If so, then the purpose of such a clause becomes reductio ad absurdum. If the carrier safely carries the cargo and delivers it to its owner at the termination of the journey, then a valuation clause is unnecessary. Only in case of a misdelivery, negligent injury, loss or similar misfortune does a valuation clause come into use. Hence the Federal courts have rightly held that the limitation of liability clause is designed for and does survive a breach of the contract of carriage." (87 F.Supp. at 697.)

On appeal, the Circuit Court, Chase, Circuit Judge, said:

"The argument rests on an analogy to admiralty cases of which The Sarnia, 2 Cir., 278 F. 459, is typical. It overlooks, however, the far-reaching effect of the principle of uniformity of treatment, which requires that the tariff be applied to all matters arising from the attempted performance of the contract. Misdelivery is not a conversion which deprives a carrier of the benefit of a tariff provision limiting liability." (189 F.2d at 942.)

While the Lichten case dealt with the misdelivery of baggage containing jewelry (and the fact that it contained jewelry was unknown to the airline), the basic reasoning of the two decisions, to wit, the necessity to afford uniformity of treatment where filed tariffs are involved, and the limitation of liability must apply in cases where the carrier is negligent or fails to follow the shipper's instructions or it is meaningless, is sound and this Court is in accord with it.

Assuming error, therefore, in the fact conclusion which we have drawn,

that the defendant did change the method of transportation from Minneapolis to New York, nevertheless, the $550 limitation provided for by the air express receipt and contained in the tariffs filed by the defendant, all of which are a part of the contract, effectively limits the liability of the defendant to $550.

In view of the Court's decision on these two points, it is unnecessary to discuss the other issues presented.

The Court will sign appropriate Findings of Fact, Conclusions of Law, and Order for Judgment. Defendant's counsel will please prepare same together with a form of Judgment.