**MARQUETTE CEMENT MANUFACTURING COMPANY and Chattanooga Rock Products Division of Vulcan Materials Company**

v.

**The LOUISVILLE AND NASHVILLE RAILROAD COMPANY.**

Civ. A. No. 4565.

United States District Court
E. D. Tennessee, S. D.
Sept. 5, 1967.

Witt, Gaither, Abernathy & Wilson, Chattanooga, Tenn., for plaintiffs.

Spears, Moore, Rebman & Williams, Chattanooga, Tenn., for defendant.

## OPINION

FRANK W. WILSON, District Judge.

This is an action for damage brought against a common carrier under the provisions of 49 U.S.C. § 20(11), which provision is sometimes referred to as the Carmack Amendment. The case is before the Court for decision upon a stipulation of facts. Marquette Cement Manufacturing Company is engaged in the business of manufacturing cement and

has a plant at Cowan, Tennessee. Chattanooga Rock Products Division of Vulcan Materials Company is, as the name indicates, a division of Vulcan Materials Company. Rock Products' place of business is located at 2001 Rossville Boulevard in Chattanooga, Tennessee, where it engages in the manufacture of Ready-Mix concrete. Another division of Vulcan Materials Company is the Concrete Pipe Division, whose place of business is located at 1111 Oak Street in Chattanooga, Tennessee, where it engages in the manufacture of concrete pipe. Both the Rock Products Division and the Concrete Pipe Division buy cement from Marquette, but each uses a different type of cement. The Concrete Pipe Division purchases only "air entrained" cement, that is, cement to which has already been added an air entraining agent. This type of cement is appropriate for use in the manufacturing of concrete pipe. On the other hand, the Rock Products Division never purchases "air entrained" cement from Marquette, but rather mixes its own air entraining agent to obtain a ready-mix concrete having the desired qualities. Previous to the shipment here involved, Marquette had always shipped cement to the Rock Products Division by way of the Louisville and Nashville Railroad Company and the Central of Georgia Railway Company. On the other hand, Marquette had always shipped an "air entrained" cement to the Concrete Pipe Division by way of the Louisville and Nashville Railroad Company and the Southern Railway Company.

Upon March 27, 1964, Marquette shipped L & N Hopper Car No. 38,454 containing bulk "air entrained" cement. A bill of lading had been prepared at Marquette. It directed that the car would be shipped to the Concrete Pipe Division at 1111 Oak Street, Chattanooga, Tennessee, and the routing was shown as the L & N Railroad and the Central of Georgia Railway. Because of the layout of the track system, the Central of Georgia Railway does not have track connections for delivery from Marquette to the Concrete Pipe Division. When Car No. 38,454 arrived in Chattanooga on or about March 29, 1964, the defendant, Louisville and Nashville Railroad Company, through one of its switching clerks, issued an inter-load switching order whereby Car No. 38,454 was directed to be delivered to Rock Products Division at 2001 Rossville Boulevard by way of Central of Georgia, rather than to the Concrete Pipe Division at 1111 Oak Street, as called for on the bill of lading. The carload of "air entrained" cement was delivered to the Rock Products Division and was used by it in its ready-mix cement plant. At the time Rock Products Division had under order from Marquette more than one carload of cement. However, Rock Products Division did not expect to receive "air entrained" cement and it is not possible to determine merely from appearance whether cement already contains an air entraining agent or not. Accordingly, the Rock Products Division added an air entraining agent to the cement after it had been unloaded and before receiving the notice of delivery from the L & N Railroad which would show that the cement was already air entrained. On March 31st the cement was processed by Rock Products Division and delivered to certain job sites in and around Chattanooga. The majority of it went to the construction site of the Calsted Nursing Home in Chattanooga to be used by the H. E. Collins Contracting Company in the structural floor system thereof. Another portion of the concrete went to the J. C. Miller Construction Company for the purpose of constructing a small cement floor in a garage. The concrete used in both of these jobs showed deficiencies and it was necessary that the same be removed in each instance.

The bill of lading showed that the cement was air-entrained, but the train clerk at the L & N who re-routed the shipment from Concrete Pipe to Rock Products had not noted that the cement was air-entrained, and in fact was uninformed as to what the designation meant. He was likewise uninformed as to what use the Vulcan Materials Company made

of the concrete it received at either of its two divisions or as to any difference in the concrete received at the two divisions.

The value of the carload of cement was $1,408.16 and the freight charges amounted to $91.10. The cost to the plaintiffs for replacing the Calsted Nursing Home floor slab was $9,558.30 and the cost of replacing the floor slab in the garage was $167.00. The plaintiffs incurred additional costs of $197.00 to a concrete testing laboratory. The plaintiffs seek to recover damages in the total sum of $11,416.56, being the total of the above items of cost, plus interest.

 First, there can be no doubt that the defendant is liable unto the plaintiffs for breach of contract by virtue of its misdelivery of the carload of cement. It was the duty of the carrier to deliver the freight at the destination designated in the contract of shipment. 13 C.J.S. Carriers Sec. 164, p. 322. The error in routing instructions would not relieve the carrier of the duty of making delivery to the destination designated on the bill of lading, nor permit the carrier to change the destination. 13 Am.Jur. 2d, "Carriers", Sec. 329. The real question with which we are here concerned is the damages to which plaintiffs are entitled by virtue of the breach. Before discussing the rules governing the measure of damage in a breach of contract action for misdelivery, it is appropriate to consider the plaintiffs' alternate contention that a negligence action would also lie for misdelivery. No authority is cited by the plaintiff in support of its tort theory. While a contract may create a state of affairs in which a general duty arises the breach of which may constitute actionable negligence, negligence will not lie where the only duty breached is one created by contract. It is only where there is a breach of a general duty, even though it may arise out of a relationship created by contract, that breach of duty may constitute actionable negligence. 38 Am.Jur., "Negligence", Sec. 621. Here the only duty

breached was the duty to deliver under a contract of carriage. Accordingly, the Court need not consider the rules of law governing the measure of damage in a tort action.

Returning to the plaintiffs' claim for damage for breach of contract, the plaintiffs claim the following elements of damages: (1) the cost of shipping charges ($91.10), (2) the value of the carload of air-entrained cement ($1,408.-16), (3) the cost of removing the adulterated concrete from the construction sites ($9,725.30), and (4) the cost of the tests performed by the laboratory ($197.-00).

 The Court had occasion to examine the rules with respect to damages for breach of contract in the case of Clark v. Ferro Corp. (D.C.Tenn., 1964), 237 F.Supp. 230. To summarize briefly the principles involved, the general purpose of the law is to place the plaintiff in the position he would have been in had the contract been fulfilled in accordance with its terms. More specifically, under the rule of Hadley v. Baxendale, (1854) 9 Ex. 341, 156 Eng. Reprint 145, 5 Eng.Rul.Cas. 502, damages recoverable for breach of contract are (1) such as may fairly and reasonably be considered as arising in the usual course of events from the breach of the contract itself or (2) such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract. This is the rule in Tennessee. See Clark v. Ferro Corp., supra, 237 F.Supp. at p. 238. The rule has been stated in terms of "foreseeability" in the Restatement of Contracts (Sec. 330):

"In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise it must be shown specifically that the defendant had reason to know the facts and to foresee the injury."

The statement providing for "special" or "consequential" damages is merely a further extension of "foreseeability". McCormick, in speaking of the rule of Hadley v. Baxendale, observes:

"This standard is in the main an objective one. It takes account of what the defendant who made the contract might then have foreseen as a reasonable man, in the light of the facts known to him, and does not confine the inquiry to what he actually did foresee. It the loss claimed is unusual, then it becomes necessary to ascertain whether the defaulting party was notified of the special circumstances * * *" McCormick on Damages, p. 565, sec. 138.

Plaintiffs, in their briefs, argue at some length that the ordinary rule of damages for breach of contract should not be applied in the instant case because (1) the Carmack Amendment [49 U.S.C. 20 (11)] has liberalized the common law rule of damages; (2) this is a case of mislabeling; and (3) this is a case of deviation, and the doctrine of deviation alters the rule of damages. The pertinent language of the Carmack Amendment reads as follows:

"* * * any common carrier, railroad, or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose lines or line such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading * * *"

It was early decided that the words "any loss or damage" do not extend the liability of a common carrier to that of an insurer. In Adams Express Co. v. Croninger, 226 U.S. 491, 506, 507, 33 S.Ct. 148, 152, 57 L.Ed. 314, 320 (1912), the Supreme Court stated that

"* * * The liability thus imposed is limited to 'any loss, injury, or damage caused by it or a succeeding carrier to whom the property may be delivered;' and plainly implies a liability for some default in its common-law duty as a common carrier."

Similarly the sparse authority available indicates that the Carmack Amendment did not alter the common law as to special damages: knowledge is a prerequisite for liability. In Pomona Products Co. v. Southern Ry., 294 F. 982 (N.Ga., 1924), plaintiff sued the railroad for loss of profits. The Court stated that, 294 F. at 983, 984,

"To render the connecting carrier liable either to the initial carrier or to consignor or consignee for special damages arising from delay which are not the ordinary, natural consequences of delay, the connecting carrier must have notice at or before receiving the shipment and undertaking the carriage."

On the other hand, special damages were awarded where the carrier had reason to know of their existence; L. E. Whitlock Truck Service, Inc. v. Regal Drilling Co., 333 F.2d 488 (10th Cir., 1964).

The cases cited by the plaintiffs are not authority for awarding special damages without prior notice. In Illinois Central Railroad v. Zucchero, 221 F.2d 934 (8th Cir., 1955), the Court held that the expense of separating damaged bananas to be an element of damages. The Court states that, 221 F.2d at 937,

"Where property has been damaged in shipment the general rule for determining the amount of damages is the difference between the market value it would have had had it been transported without damage and its market value in its damaged condition."

In including the cost of separating the damaged fruit, the Court adheres to this formula. If the bananas had been unseparated, any prospective purchaser would have deducted the expense of sepa-

ration from any offer. Thus, the economic position of the plaintiff reflected in the nature of the bananas was the same whether he actually paid for the separation or had this expense reflected in a lower price offered for the fruit.

In Conditioned Air Corp. v. Rock Island M. T. Co., 253 Iowa 961, 114 N.W. 2d 304, 3 A.L.R.3d 679, cert. den. 371 U.S. 825, 83 S.Ct. 46, 9 L.Ed.2d 64 (1962), the Court awarded the plaintiff the cost of overhead attributable to replacing the goods. It is apparent that the Court considers this item as part of the cost of producing the goods rather than special damages. The Court specifically recognizes the different treatment given to special damages, as it states, 114 N.W.2d at 308, 3 A.L.R.3d at 685, that

> "The general rule is that special damages are not recoverable from a carrier for injury to goods shipped unless it had notice or knowledge of the special circumstances from which such damages would flow.

■ Notwithstanding the common law limitation on special damages, the plaintiffs claim the defendant's actions constituted a mislabeling or a deviation either of which would remove the distinction placed upon special damages.

It is difficult to see how this could be characterized as a case of mislabeling. There is nothing in the record to indicate that the carrier labeled the goods in any manner. This rather clearly distinguishes the instant case from the cases of Wabash R. Co. v. Campbell, 219 Ill. 312, 76 N.E. 346, 3 L.R.A.,N.S., 1092 and Ohio-West Virginia Co. v. Chesapeake & O. R. Co., 97 W.Va. 61, 124 S.E. 587, 38 A.L.R. 1439. In the *Campbell* case the carrier mislabeled cattle as "Southern cattle", a term indicating to cattlemen that the cattle were infected with, or had been exposed to, certain diseases. In the *Ohio-West Virginia Company* case, a tank car of kerosene was mislabeled by the carrier as gasoline. The kerosene was mixed with a large quantity of gasoline, ruining the gasoline for use in passenger automobiles. In the present case,

there is nothing to show that the carrier represented the cement to be anything. Marquette always shipped air-entrained cement to Concrete Pipe and always shipped "non-air-entrained" cement to Rock Products. Defendant changed the destination of the shipment from Concrete Pipe to Rock Products. There is nothing to show that defendant ever knew of the difference in the shipments respectively to Concrete Pipe and Rock Products, or that such difference was significant. The Court is of the opinion that this cannot be characterized as a case of mislabeling or misrepresentation.

■ Plaintiff also contends that the doctrine of deviation is applicable in this case and renders defendant liable for all damages claimed. The doctrine of deviation is a principle of law which had its origins in maritime commerce and at one time was rather widely applied. It is explained somewhat in the case of The Indrapura, 171 F. 929 (Or., 1909):

> "The term 'deviation' in the law of shipping has at the present day a varied meaning and wide significance. It was originally employed, no doubt, for the purpose its lexicographical definition implies, namely, to express the wandering or straying of a vessel from the customary course of a voyage, but it seems now to comprehend in general every conduct of a ship or other vehicle used in commerce tending to vary or increase the risk incident to shipment. Thus delay in starting a shipment when unreasonable or unexcused came to be regarded as a deviation, not because the vehicle employed departed from the usual route of travel, but because the risk of shipment was changed or increased, and became, in effect, not the same as the one with reference to which the parties contracted."

Other cases have extended the doctrine of deviation to include such things as the manner in which cargo is stored. For example, see Searoad Shipping Co. v. E. I. duPont de Nemours & Co., (C.A.5, 1966) 361 F.2d 833; Pioneer Import Corp. v. The Lafcomo, (C.A.2, 1947) 159 F.2d 654; Jones v. The Flying Clipper,

(D.C.N.Y., 1953) 116 F.Supp. 386; The Sarnia, (C.A.2, 1921) 278 F. 459, and other cases.

Two questions arise concerning the application of the doctrine of deviation: (1) what damages may be recovered under the doctrine and (2) the point in time at which such damages must occur. The Court has carefully examined the cases applying the doctrine of deviation. In all cases in which the doctrine has been applied, the damages recovered have not exceeded the value of the goods and the loss or injury in each case occurred while the goods were still in the control of the carrier. No case found by the Court has awarded consequential damages and likewise no case found by the Court has granted recovery for injury which occurred after delivery of the goods.

The application of the doctrine of deviation in modern cases dealing with carriers who operate under filed tariffs under the Interstate Commerce Commission or the Civil Aeronautics Board is open to considerable question. In the case of Minneapolis Society of Fine Arts v. Railway Express Agency, (D.C.Minn., 1963) 213 F.Supp. 129, the Court observed:

"The deviation doctrine is purely of admiralty origin and while it has been applied to some cases involving land transit, no recent federal cases have been cited to, or found by, the Court which make the doctrine applicable to land and air transit in conveyances which operate under filed tariffs such as do the railroads under the Interstate Commerce Commission or the air lines under the Civil Aeronautics Board."

The disinclination of the courts to apply the doctrine of deviation to carriers such as those described apparently serves the policy of uniformity.

From its analysis of the deviation cases, the Court is of the opinion that under the circumstances presented in the instant case the doctrine of deviation is not applicable to hold the defendant liable for the damages sought in this case.

The preceding analysis indicates that the common law requirement of notice has not been altered by the Carmack Amendment and that the doctrines of mislabeling and deviation have no application to this case. There remains to be considered which of the elements of damage claimed by the plaintiff fall within the common law rules of damage for breach of contract. In this regard it would appear clear that the plaintiff would be entitled to recover any damages sustained by it which may fairly be supposed to have been within the contemplation of the parties at the time the contract was made. These would be such damages as might naturally be expected to follow the breach of contract and would include the value of the shipment and the transportation charges paid thereon. 13 Am.Jur.2d, "Carriers" Sec. 447. Thus the plaintiff would be entitled to recover the sum of $1,408.16 as the value of the shipment and the sum of $91.10 as the cost of shipment paid.

With respect to the remaining items of damage claimed by the plaintiffs, that is the cost of testing and removing the defective concrete from construction sites, such damages may only be considered as special or consequential damages. With respect to their recovery the issue then arises as to whether the special circumstances giving rise to the damages were communicated to or known by the defendant at the time the contract of carriage was made. In order to recover special damages under the circumstances of this case, it must appear that at the time of the making of the contract of carriage the defendant had reasonable notice or knowledge of the special conditions rendering such damages the natural and probable result of the breach. Illinois Central Ry. Co. v. Johnson & Fleming, 116 Tenn. 624, 94 S.W. 600; Machine Co. v. Union Compress & Storage Co., 105 Tenn. 187, 58 S.W. 270. See also Kerr Steamship Co., Inc. v. R. C. A., 245 N.Y. 284, 157 N.E. 140, 55 A.L.R. 1139; 13 Am.Jur.2d "Carriers", Sec. 447. The Court is of the opinion that the evidence does not establish such no-

tice or knowledge upon the part of the defendant. It is true that the bill of lading did designate the shipment as "air-entrained cement". This information is not sufficient, however, to put the carrier on notice as to the use for which it was to be put. Nor was it sufficient to put the carrier on notice that an additional air-entraining agent would be added to the cement by the plaintiff, thereby rendering it unsuited for structural use. The notice here received by the carrier by the inclusion of the words "air-entrained cement" upon the bill of lading was not sufficient to render reasonably foreseeable the subsequent events which resulted in the expenses incurred by the plaintiff in testing and in removing the defective concrete. The defendant accordingly would not be liable for the sum of $197.00 incurred by the plaintiff in having concrete tests performed nor the sum of $9,725.30 incurred by the plaintiff in having defective concrete removed. The plaintiff would be entitled to recover the value of the shipment of cement and the shipping costs paid thereon, or the total sum of $1,499.-26.

A judgment will enter accordingly.