**ROCKY FORD MOVING VANS, INC.,**
Appellee,

v.

**UNITED STATES of America,**
Appellant.

No. 73–1808.

United States Court of Appeals,
Eighth Circuit.

Submitted May 13, 1974.

Decided Aug. 23, 1974.

John K. Villa, Atty., U. S. Dept. of Justice, Washington, D. C., for appellant.

Vincent Foster, Jr., Little Rock, Ark., for appellee.

Before VOGEL, Senior Circuit Judge, and GIBSON and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

This case arises out of a contract entered into by the United States and Rocky Ford Moving Vans, Inc. (Rocky Ford) for the interstate shipment of personal property belonging to a member of the Armed Services. Briefly stated, the facts reveal that Rocky Ford, an interstate carrier of household goods, agreed to move from Arkansas to Indiana the personal property of one Gordon C. Greider, a Captain in the United States Air Force. The goods, actually valued at $15,081.42, were released to Rocky Ford under a bill of lading signed by Captain Greider at a value of 60 cents per pound or a total of $4,308.00.

The contract of carriage between the government and Rocky Ford forbade storage of the goods shipped thereunder in any warehouse which had not received the approval of the Military Traffic Management and Terminal Service (MTMTS).[1]

Rocky Ford instructed its agent, Charlie Diffee, d/b/a Charlie Diffee Moving Company, to pick up Greider's belongings at Little Rock Air Force Base in Jacksonville and to hold the shipment until the arrival of a Rocky Ford truck. Diffee did so on December 16, 1969, but, during a heavy rain on the following morning, he moved the goods to a nearby warehouse. While stored in that warehouse, which was not one approved by the MTMTS, Greider's personal property was totally destroyed by fire.

In a suit brought by Rocky Ford against the United States to recover for carriage of personal property of military personnel,[2] the Government counterclaimed for the actual value of the goods of Greider destroyed by fire. The District Court[3] held that the Government's counterclaim for damages on behalf of Greider was limited by the contract to the release value of 60 cents per pound, or $4,308.00[4]. Having carefully studied Judge Eisele's soundly reasoned unpublished opinion as well as the counterar-

guments presented by appellant, the United States, we affirm.

As Judge Eisele did below, we rely primarily upon the policy underlying the Carmack Amendment to the Act to Regulate Commerce, 49 U.S.C. § 20(11). That legislation, which imposes upon the initial or the delivering carrier full liability for any actual loss incurred while in interstate transit, contains the following proviso:

\* \* \* That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, first, to baggage carried on passenger trains or boats, or trains or boats carrying passengers; second, to property, except ordinary livestock, received for transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so

1. Evidence in the record indicates that to meet the approval of the Department of Defense, a warehouse must be protected by an approved sprinkler system, or by an approved fire detection and reporting system, or it must have a fire contents rate of not more than $.60 per $100 valuation of goods stored annually. In all cases, an approved warehouse must have available a responsive local fire department and a water supply adequate for firefighting purposes.

2. 28 U.S.C. § 1346 provides in part that:
   (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
   \* \* \* \* \*
   (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution or any Act of Congress, or any regulation of an executive depart-

ment, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.
   \* \* \* \* \*

3. Honorable Garnett Thomas Eisele, Eastern District of Arkansas.

4. Third-party claims by Rocky Ford and the United States against Diffee were dismissed by the District Court and are not in issue here.

declared or released, and shall not, so far as relates to values, be held to be a violation of section 10 of this title * * *.

▮ The Carmack Amendment thus expressly recognizes the right of a shipper and carrier to establish an agreed value of the goods to be shipped which limits the carrier's liability and permits a shipper thereby to benefit from a lower rate. Strickland Transportation Co. v. United States, 334 F.2d 172 (5th Cir. 1964). In adopting the Carmack Amendment, Congress intended to impose a single uniform federal rule upon the obligations of carriers operating in interstate commerce. New York, New Haven & Hartford R. R. Co. v. Nothnagle, 346 U.S. 128, 73 S.Ct. 986, 97 L.Ed. 1500 (1953); Atchison, Topeka & Santa Fe Ry. v. Harold, 241 U.S. 371, 36 S.Ct. 665, 60 L.Ed. 1050 (1916); Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913). Such statutory provisions supercede "the diverse requirements of state legislation and decisions", Southern Ry. v. Prescott, 240 U.S. 632, 639–640, 36 S.Ct. 469, 472, 60 L.Ed. 836 (1916), and render invalid all "agreement[s] in derogation of them * * *." Southwestern Sugar & Molasses Co., Inc. v. River Terminals Corp., 360 U.S. 411, 420 n. 9, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959).

▮ Appellant has attempted to circumvent the result dictated by the Carmack Amendment by invoking the "material deviation" doctrine applicable in admiralty cases. *See*, e. g., The Sarnia, 278 F. 459 (2d Cir. 1921), cert. denied, 258 U.S. 625, 42 S.Ct. 382, 66 L. Ed. 797 (1922). Under that doctrine, a contractual limitation of liability will not restrict the shipper's recovery where the carrier has breached a material or essential provision of the underlying agreement, for such a deviation arguably represents a complete failure of consideration and compels rescission of the entire carriage contract. The Government's position is that storage in an approved warehouse was a *quid pro quo* or a fundamental part of its bargain with Rocky Ford, inserted in the contract in exchange for the limited value declaration.[5] While the Amendment itself is silent with respect to "material deviations", we agree with Judge Eisele that that admiralty law doctrine has no application in the context of regulated interstate commerce, which is governed by the overriding federal policy of uniformity. Lichten v. Eastern Airlines, Inc., 189 F.2d 939 (2d Cir. 1951); Minneapolis Society of Fine Arts v. Railway Express Agency, Inc., 213 F.Supp. 129 (D.Minn.1963).

▮ Nor do we find merit, under the facts in this case, in the Government's attempted distinction between willful breaches of carriage contracts and those which are merely negligent. The United States Supreme Court has described the words of the Carmack Amendment as "comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination." Southeastern Express Co. v. Pastime Amusement Co., 299 U.S. 28, 29, 57 S.Ct. 73, 74, 81 L.Ed. 20 (1936). This is not a case where the carrier has purposefully converted the entrusted property for its own use or gain, *see* Glickfeld v. Howard Van Lines, Inc., 213 F.2d 723 (9th Cir. 1954), but rather one in which the carrier placed the goods in storage simply because "it

---

5. The Government interprets the approved-warehouse clause as a specific risk-reducing provision, a violation of which arguably upsets the carefully negotiated bargain. However, there is nothing in the record to suggest that the government paid anything in addition to the regular rate for the privilege of approving the warehouses to be used by the carrier. In this respect this case must be distinguished from those in which the court found a condition to be supported by independent consideration. See Watson Bros. Transportation Co. v. Feinberg Kosher Sausage Co., 193 F.2d 283 (8th Cir. 1951); Johnson v. Bekins Moving & Storage Co., 86 Idaho 569, 389 P.2d 109 (1963), cert. denied, 379 U.S. 913, 85 S.Ct. 257, 13 L.Ed.2d 184 (1964).

was raining that morning like the devil and * * * [the truck] was sitting by the front of the warehouse."[6] *See also* Mitchell v. Union Pacific R. R. Co., 188 F.Supp. 869 (S.D.Cal.1960) (in absence of fraud, willful misconduct of carrier's employees does not vitiate value declaration). In any event, Diffee did not willfully ignite the property in question.

■ Finally, we observe that the bill of lading prepared by Diffee for Rocky Ford contained a clear notation of the 60 cents-per-pound release value directly above the line on which Captain Greider signed his name. At trial Charlie Diffee testified that that portion of the bill of lading afforded Captain Greider the choice of accepting the rate represented by the 60 cents-per-pound release value or of purchasing additional insurance for his property by paying an extra premium therefor. William S. Hatchell, sales manager for Rocky Ford, testified that an extra insurance or release valuation charge is assessed whenever the shipper elects to release his goods at a lump sum value rather than at the standard value of 60 cents per pound per article.[7] Under the Carmack Amendment, where the shipper has been given such an option and has elected to release his goods at the standard value in exchange for a lower rate, his recovery in the event of loss will be limited by the release value chosen. Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913); Sorensen-Christian Industries, Inc. v. Railway Express Agency, Inc., 434 F.2d 867 (4th Cir. 1970); *cf.* New York, New Haven & Hartford R. R. Co. v. Nothnagle, 346 U.S. 128, 73 S.Ct. 986, 97 L.Ed. 1500 (1953); Chandler v. Aero Mayflower

Transit Co., 374 F.2d 129 (4th Cir. 1967).

We conclude that these facts together with the rules of law and legislative policies discussed above compel affirmance of the decision of the District Court.

---

6. Diffee offered this explanation in a deposition taken by counsel for plaintiff, Rocky Ford, on July 28, 1972.

7. In addition, the Government Rate Tender I.C.C. No. 1–V, accepted by the MTMTS to govern all government shipments in the absence of an individual tender, provides that all shipments moving on government bills of lading are deemed released at a value of 60 cents per pound per article unless otherwise specified on the bill. The shipment in question was released under both the standard bill of lading prepared by Diffee and a United States Government bill of lading.