537 So.2d 1065 (1989)
FLORIDA EAST COAST RAILWAY COMPANY, Appellant,
v.
BEAVER STREET FISHERIES, INC., et al., Appellees.
No. 88-246.
District Court of Appeal of Florida, First District.
January 18, 1989.
*1066 Lawrence J. Roberts, of Kroll & Tract, P.A., Miami, for appellant.
John B. Culp, Jr., P.A., Jacksonville, for appellees.
Gary A. Bubb, of Toole, Bubb & Beale, P.A., Jacksonville, amicus curiae, for Bermuda Atlantic Lines, Ltd.
JOANOS, Judge.
Florida East Coast Railway Company (FEC) appeals a final judgment following a bench trial holding it liable for all costs associated with damage to two containers of food consigned to Club Med in the British West Indies. The issues for our review are: (1) whether the trial court erred in awarding Beaver Street Fisheries, Inc. (BSF) all costs associated with an emergency reshipment of goods by chartered aircraft, together with ocean freight charges for the carriage of the containers beyond the destination shown on FEC's bills of lading; (2) whether the trial court erred in finding that Bermuda Atlantic Lines, Ltd. (BAL) did not breach its duty of due care under its ocean bill of lading; and (3) whether the trial court erred in finding that FEC had altered the voyage temperature setting on the two food containers. We affirm in part, and reverse in part.
The two containers which form the subject of this appeal were loaded in Jacksonville, Florida, on July 31, 1985, for transport by FEC to Fort Lauderdale, Florida. Container 336 was loaded by BSF employees with frozen meats and other frozen food products. The container was then closed and sealed, and the temperature gauge was set at zero degrees Fahrenheit. Container 336 left Jacksonville on July 31, 1985, at 5:30 p.m. by FEC train 5/97 on flatcar DTI 90126, and arrived in Fort Lauderdale on August 1, 1985, at 2:45 a.m. At approximately 11:25 a.m., on August 1, 1985, container 336 was picked up by Port Denison, Inc., agent for BAL. Port Denison's facility is located in Dania, some seven miles from FEC's Fort Lauderdale rail yard.
Container 337 was loaded by Movsovitz & Sons, Inc., a supplier for BSF, with produce and other perishable food items. Employees of both BSF and Movsovitz supervised the packing of the container, and both BSF and Movsovitz employees checked the temperature setting of the container before it left the Movsovitz premises. A Partlow temperature recording device was placed inside the container on top of the shipment. The container was set and operating at thirty-eight degrees Fahrenheit when it left the Movsovitz premises at 6:17 p.m. on July 31, 1985. Container 337 left Jacksonville on July 31, 1985, at 9:45 p.m., by FEC train TTWX 973222, and arrived in Fort Lauderdale on August 1, 1985, at 9:00 a.m. Port Denison employees picked up container 337 from FEC's Fort Lauderdale rail yard at noon on August 1, 1985. When the container left FEC custody, the original shipper's seal was intact.
The August 1, 1985, Port Denison refrigeration temperature logs showed that container 336 (which contained frozen meats) was set at thirty-eight degrees Fahrenheit, and container 337 (which contained produce) was set at zero degrees Fahrenheit. Container 337 was opened on August 1, 1985, by Port Denison employees, so that sixteen cartons of yogurt could be added. *1067 On August 2, 1985, container 337 was opened a second time to add four crates of spinach.
Containers 336 and 337 remained in the Port Denison storage from August 1 through 6, 1985. On August 6, 1985, the containers were placed on the BAL barge MOBRO 1207, for ocean carriage to Providenciales, British West Indies. The containers arrived in Providenciales on August 10, 1985, and were delivered to the consignee Club Med, sometime between 3:00 a.m. and 8:00 a.m. on August 10, 1985. When the containers were opened, they revealed that the frozen meat in container 336 had thawed and deteriorated, and the produce in container 337 had frozen solid. The containers were resealed, the temperatures were set at zero degrees, and they were returned to Port Denison on a BAL vessel.
On August 16, 1985, the containers arrived at Port Denison in Dania, where they were opened and examined in the presence of representatives from FEC, BSF, and BAL. After a determination that the cargo had no salvage value, it was dumped. During the joint survey or examination, the Partlow temperature recording device was retrieved from container 337. The tape removed from the device indicated the temperature in container 337 remained fairly steady at thirty-five to thirty-two degrees from the time it was started on July 31, 1985, until approximately 3:00 a.m. on August 1, 1985, when it began to fall, reaching fourteen degrees Fahrenheit at approximately 6:00 a.m. on August 1, 1985. At that point, the temperature began to rise, until it reached thirty-seven to thirty-eight degrees Fahrenheit some time prior to 7:00 a.m., on August 1, 1985. Thereafter, the temperature fell to four degrees Fahrenheit, where it remained for the balance of its sixteen-day operation, except for periodic fluctuations.
In the final judgment, BSF was awarded the sum of $68,871.90, together with prejudgment interest of $18,780.00, for a total of $87,651.90. While the judgment does not set forth findings of fact from which we might ascertain the precise elements of damages encompassed by the award, our examination of the record leads us to conclude that the amount assessed against FEC contemplates the replacement cost of the damaged shipment, the ocean freight charges, and the cost of the replacement shipment by jet charter.
As a preliminary matter, we note the well settled principle that a trial court's findings of fact come to an appellate court clothed with a presumption of correctness, and will not be disturbed unless clearly erroneous or without any support in the record. Shaw v. Shaw, 334 So.2d 13 (Fla. 1976); Oceanic International Corp. v. Lantana Boatyard, 402 So.2d 507 (Fla. 4th DCA 1981). A decision will be found to be "clearly erroneous" only if the appellate court determines that (1) there is an absence of substantial evidence to support the trial court's express or inferential finding, (2) a finding is clearly against the weight of the evidence, or (3) the trial court misapplied the law to the established facts. Holland v. Gross, 89 So.2d 255, 258 (Fla. 1956). See also Randy International, Ltd. v. American Excess Corp., 501 So.2d 667, 670 (Fla. 3d DCA 1987); Zinger v. Gattis, 382 So.2d 379 (Fla. 5th DCA 1980). In other words, the test is whether the trial court's judgment is supported by competent substantial evidence. Shaw v. Shaw, supra.
Although a trial court is not required to set forth findings of fact or a rationale for its decision, "fairness to litigants and appellate courts make this desirable." Surratt v. Fleming, 309 So.2d 614, 615 (Fla. 1st DCA 1975), cert. denied, 336 So.2d 600 (Fla. 1976). In the absence of express findings of fact, an appellate court sometimes will attempt to interpolate missing findings so as to reconcile the judgment with the evidence. Should it prove impossible to do so, the court may relinquish jurisdiction and remand with directions to the trial court to enter an order nunc pro tunc setting forth the facts or grounds relied upon for the decision. Surratt v. Fleming, 309 So.2d at 615.
The counter to the foregoing legal principles is the rule that the trial court's theories or reasoning are not controlling on the *1068 appellate court. Therefore, should the trial court assign an erroneous reason for the judgment, the judgment can and will be affirmed if it can be sustained by any theory or principle of law. In Re Estate of Yohn, 238 So.2d 290, 295 (Fla. 1970); Forte Towers, Inc. v. City of Miami Beach, 360 So.2d 81, 82 (Fla.3d DCA 1978), cert. denied, 370 So.2d 459 (Fla. 1979).
Turning now to the first issue raised in this appeal, it is undisputed that a carrier is liable for damage caused by breach of its duty to use reasonable care in the transportation of goods. American Foreign Insurance Association v. Seatrain Lines of Puerto Rico, 689 F.2d 295, 299 (1st Cir.1982). However, a failure to use due care cannot convert a breach of contract action to one in tort by an allegation that the failure to use due care was wanton or negligent. Gibson v. Greyhound Bus Lines, Inc., 409 F. Supp. 321 (M.D.Fla.), aff'd, 539 F.2d 708 (5th Cir.1976). See also Florida Power & Light Co. v. Westinghouse Electric Corp., 510 So.2d 899, 902 (Fla. 1987). Moreover, at common law a common carrier is liable only for damage occurring during its portion of the transportation. Beautifax, Inc. v. Puerto Rico Marine Management, Inc., 611 F. Supp. 537 (D.C.Md. 1985).
The purpose of damages for breach of contract is to restore the injured party to the position he would have been in had the contract been performed according to its terms. In the process, "the common law also seeks to protect the defendant from unforeseeable large losses to the plaintiff." Hector Martinez & Co. v. Southern Pacific Transportation Co., 606 F.2d 106, 108-109 (5th Cir.1979), cert. denied, 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980); Marquette Cement Mfg. Co. v. Louisville & Nashville R.R. Co., 281 F. Supp. 944 (E.D.Tenn. 1967), aff'd, 406 F.2d 731 (6th Cir.1969).
Under the rule articulated in Hadley v. Baxendale, 9 Ex. 341, 156 Eng.Rep. 145 (1854), the damages recoverable for breach of contract are: (1) such as may fairly and reasonably be considered as arising in the usual course of events from the breach of contract itself, or (2) such as may reasonably be supposed to have been in contemplation of the parties at the time they made the contract. Marquette Cement v. Louisville & Nashville R.R. Co., 281 F. Supp. at 947. See also Augustine v. Southern Bell Telephone & Telegraph Company, 91 So.2d 320, 323 (Fla. 1956). In other words, "general damages are awarded only if injury were foreseeable to a reasonable man and ... special damages are awarded only if actual notice were given to the carrier of the possibility of injury. Damage is foreseeable by the carrier if it is the proximate and usual consequence of the carrier's action." (emphasis supplied). Hector Martinez v. Southern Pacific, 606 F.2d at 109, citing 11 Williston on Contracts, § 1344, at 226 (3d ed. W. Jaeger 1986). See also Marquette, 281 F. Supp. at 949; 9 Fla.Jur.2d, Carriers § 82 (1979). Thus, knowledge is a prerequisite for liability for special damages. Marquette, 281 F. Supp. at 948.
The general rule for determining damages when property is injured or lost during shipment is the difference between the market value the property would have had if it had been transported safely, and the market value of the property in its damaged condition. Gulf, Colorado, & Santa Fe Railway Co. v. Texas Packing Co., 244 U.S. 31, 37 S.Ct. 487, 61 L.Ed. 970 (1917); Contempo Metal Furniture Co. of California v. East Texas Motor Freight Lines, Inc., 661 F.2d 761, 764 (9th Cir.1981); Reed v. Aaacon Auto Transport, Inc., 637 F.2d 1302 (10th Cir.1981).
In the instant case, it is undisputed that FEC was on notice that the ultimate destination of containers 336 and 337 was Club Med, Providenciales, British West Indies. Nevertheless, it is also undisputed that (1) FEC's contract of carriage contemplated only the transport of the containers from FEC's Jacksonville rail yard to its Fort Lauderdale rail yard, and (2) FEC was without knowledge that loss or damage to the shipment would mean that Club Med would be completely without food for its six hundred guests. Thus, there is no competent substantial evidence to support a *1069 finding of FEC liability for the special damages associated with the replacement shipment by jet charter.
With regard to the second issue, as a general rule, when transportation of a refrigerated container is effected by two separate carriers, upon transfer, the employees of the second carrier have a duty to check the shipping order directive regarding the required container temperature setting against the actual container setting. If the actual setting of the container varies substantially from the shipping order figure, the second carrier is charged with notice that further inquiry is indicated, and a failure to so inquire will constitute negligence. Gordon H. Mooney, Ltd. v. Farrell Lines, Inc., 616 F.2d 619, 624 (2d Cir.), cert. denied, 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980).
In Mooney and in Beautifax, Inc., as in the instant case, two different carriers were involved. In Beautifax, the court noted there were bills of lading covering the land portion of the trip, and a second bill of lading for the ocean portion of the transportation. Charges for freight transportation were assessed individually by the respective carriers. Furthermore, there was no arrangement between the two carriers which gave either such control of the enterprise that it could be characterized as continuous transportation in a common enterprise. On these facts, the court characterized the transportation as two trips, and held that in that case, liability would not attach to the land carrier because uncontroverted evidence established that no damage to the goods occurred during the land portion of the transportation.
In Mooney, however, the evidence showed that the ocean carrier-shipper was negligent in its recording of the appropriate temperature setting during transfer of refrigerated cargo to the land carrier, and the land carrier was negligent for failing to make further inquiry before it turned up the temperature setting on a refrigerated container. The court noted there was a clear trend in the law toward a rule allowing contribution among joint tortfeasors. Since the facts showed joint liability of the ocean carrier and inland trucker, the court held contribution was available and remanded with directions that costs should be shared by both carriers. 616 F.2d at 625-626.
The record in this case presents much the same scenario as Beautifax, i.e., the transportation in this case could be characterized as two separate trips. Although the bills of lading indicated Providenciales, British West Indies, as the ultimate destination, FEC only furnished and billed for transportation from Jacksonville to Fort Lauderdale. BAL furnished and billed for transportation from Fort Lauderdale to Providenciales. Furthermore, neither carrier exercised such control that the transportation could be termed a common enterprise. Therefore, under common law, FEC could be liable only for damage occurring during its portion of the total transportation. Beautifax, Inc., 611 F. Supp. at 543.
Similarly, the record in this case reflects much the same scenario which resulted in a finding of joint liability in Mooney. The second shipper, BAL, failed to check the temperature settings reflected on the shipping documents against the actual temperature settings on the containers. In addition, BAL agents opened the produce container on two separate occasions, yet failed to note that the container was set at freezing temperature. Comparable conduct in Mooney resulted in a finding of joint liability. The judgment in this case contains no findings of fact, and we have been unable to discern from the record the basis for the trial court's determination that FEC bears sole responsibility for the entire loss.
The third issue concerns the trial court's implicit finding that FEC altered the container temperature settings. As a general rule, the trial court may not pit its judgment against that of an expert on highly technical matters. State Department of Transportation v. Myers, 237 So.2d 257 (Fla. 1st DCA 1970). In other words, in the absence of conflicting expert testimony, "when an issue must be resolved *1070 on the basis of technical evidence on which only experts are qualified to speak, and such evidence is not in dispute, the court is not justified in rejecting it unless it is so palpably incredible, illogical, and unreasonable as to be unworthy of belief or otherwise open to doubt from some reasonable point of view." However, the corollary rule is that "when facts sought to be proved by expert testimony are within the ordinary experience of the members of the jury, or disputed by lay testimony, the conclusions to be drawn from such expert testimony will be left to the jury." (emphasis supplied). 237 So.2d at 261.
In the instant case, expert testimony was introduced by FEC with regard to the interpretation to be given the temperature variations recorded by the Therma-Gard Temperature Recording device. According to Mr. Foster, the FEC expert, the recorder (1) is inaccurate in its charting of time when related to real time, with the greatest inaccuracy occurring during the earlier portion of the recording; and (2) the wide temperature variation recorded by the device could not have occurred in a sealed container. The expert testified that the extreme temperature rise would have occurred only by exposure of the container's contents to ambient temperatures, i.e., to a door opening. By testing the recorder time error, Mr. Foster concluded the temperature rise occurred when the container was opened at Port Denison, when BAL agents added cargo.
On the other hand, several lay witnesses experienced in the field of refrigeration, testified that the large variation or "spike" recorded on the temperature graph was a normal defrost cycle. These lay witnesses further testified that the sharp temperature drop from thirty-eight degrees to zero degrees occurred between 3:00 and 4:00 a.m. on August 1, 1985, when container 337 was in FEC control.
Apparently, the underlying rationale for BSF's theory that the temperature controls were changed by FEC was a billing sheet that suggested that both containers were transported on the same flatcar. However, FEC offered unrefuted evidence that the containers left Jacksonville at different times, were transported by different trains, and arrived in Fort Lauderdale at different times. FEC explained that for customer convenience, billing charges are compiled on one statement when it is possible to do so.
Neither party questions the technical nature of the evidence pertaining to refrigeration and to the Thermo-Gard recording device. It is also undisputed that FEC's witness, Mr. Foster, was the only witness accepted by the trial court as an expert. In addition, BSF and BAL presented conflicting testimony concerning the identity of the person who originally set the temperature on container 337. Nevertheless, the testing procedures described by Mr. Foster and the testimony of the lay witnesses concerning defrost cycles are matters within the ordinary experience of jurors, or, in this case, of the trial court sitting as trier of fact. Consequently, the trial court was not bound by the expert's opinion in this case.
In summary, with regard to the first issue, we consider that a carrier's liability for damages due to loss or injury to a food shipment slated for a facility in the British West Indies should contemplate the inconvenience occasioned by the loss or the attendant delay for a replacement shipment. On the other hand, we do not consider it reasonable that a carrier would foresee circumstances such as those which obtained in this case, i.e., that loss of the food shipment would leave Club Med completely without food for its guests. Rather, a reasonable person could consider that a large resort hotel situated on a Caribbean Island would maintain a reserve food supply, in anticipation of late shipments or an emergency situation such as a hurricane. By the same token, BSF agrees that FEC was without knowledge that Club Med would be completely without food for its guests if the food in containers 336 and 337 did not arrive in good condition. Therefore, we conclude that special damages are not warranted in the circumstances of this case, and reverse on this issue.
*1071 With regard to the second issue, we find the record evidence in this case is inconsistent with any theory that BAL was absolved of all negligence. Since we are unable to ascertain what the trial court determined with regard to BAL's role in the loss suffered by BSF, we reverse and remand for a determination and specific findings concerning BAL's negligence or lack thereof.
With regard to the third issue, the record contains evidence, albeit conflicting, from which one might reasonably infer that the temperature settings were changed while the containers were in FEC control. Therefore, we affirm the trial court's determination in this regard.
Accordingly, we reverse as to point one insofar as the trial court's determination found FEC liable for special damages; we reverse and remand as to point two, for a further determination or clarification concerning BAL's possible negligence; and we affirm as to point three, which pertains to the trial court's implicit determination that FEC altered the voyage temperature settings on the containers.
WIGGINTON and BARFIELD, JJ., concur.